IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

SHALON DAVANTE FREEMAN,

        Defendant.

No. 3:15-cr-00448-HZ

OPINION & ORDER

Leah K. Bolstad
U.S. Attorney's Office, District of Oregon
1000 SW Third Ave., Ste. 600
Portland, OR 97204

    Attorney for Plaintiff

Christopher J. Schatz
Office of the Federal Public Defender
101 SW Main St., Ste. 1700
Portland, OR 97204

    Attorney for Defendant

OPINION & ORDER – 1

HERNÁNDEZ, District Judge:

Defendant Shalon Davante Freeman is charged with one count of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1). Freeman moves to suppress the firearm officers observed sticking out of his pocket during a traffic stop in northeast Portland, and statements he made to officers during the stop. Because officers had reasonable suspicion to stop the car, the length of the stop was reasonable, and the gun was in plain view, Freeman's motion to suppress the physical evidence is denied. His motion to suppress statements made to the police is denied as to statements he made during the initial encounter with Officer Sherwood; the Court reserves ruling on the admissibility of statements made after he produced a white card purporting to assert various rights to Officer Sherwood.

## BACKGROUND[1]

In September of 2015, police responding to multiple reports of gunshots in North Portland found a gold Dodge Intrepid with its driver door open and punctured with bullet holes, no driver or passengers on the scene. While officers investigated, Freeman and two other individuals returned to the scene and confirmed that Freeman was the driver and intended target of the shooting; he did not cooperate further with police. Portland Police Bureau Officer Michael Sherwood and his partner David Hughes responded to the scene as members of the Gang Enforcement Team ("GET"). Officers learned that Freeman was an active member of the Woodlawn Park Blood gang, and they believed he was targeted by rival gang members.

Just before 11:20 p.m. on October 23, 2015, Officers Hughes and Sherwood were patrolling the Woodlawn neighborhood in northeast Portland. While driving their unmarked

---

[1] The Court heard testimony and received evidence related to Freeman's motion to suppress at hearings on June 22, June 28, and July 20, 2016. What follows is a summary of the Court's factual findings based on its evaluation of the credibility of the witnesses' testimony and the probative value of the evidence submitted.

patrol car at the intersection of Northeast 15th and Dekum Street, Officer Sherwood recognized a car as it rolled past, westbound on Dekum—the gold Dodge Intrepid from the September shooting. Officer Sherwood pointed out the car to Officer Hughes, and turned onto Dekum to follow it. With a car between the officers and the Dodge, the trio of vehicles trailed a TriMet bus as it traveled past Woodlawn Park, made a stop, and continued westbound. Officer Hughes ran the vehicle's license plate. The car was registered to Christina Burlacu and its insurance appeared to have expired in January of 2015. Officer Hughes also confirmed that it was, in fact, the car connected to Freeman and the September shooting.

As Officer Hughes was reviewing the database information about the Dodge, the car suddenly swerved into the opposite lane for oncoming traffic and then quickly moved back to its lane, in an "S-shaped" motion, multiple times. The officers testified that the Dodge was following the TriMet bus very closely, as near as five or ten feet, and was darting into the other lane in such a way that other drivers would not be able to react safely. They decided to stop the car for failing to drive within its lane.[2] At 11:20 p.m., Officer Sherwood turned on the patrol car's lights, and the Dodge pulled over between Grand Avenue and Martin Luther King Jr. Boulevard, partially blocking the driveway to a bar. Officers Sherwood and Hughes stopped behind the Dodge, exited the patrol car, and approached—Officer Hughes on the passenger side and Officer Sherwood on the driver side.

Officer Sherwood asked the driver, the car's sole occupant, why he was swerving in such a reckless fashion. The driver apologized and responded that he was considering passing the bus. Officer Sherwood asked for his driver's license, insurance, and registration. His license

---

[2] "[A] a person commits the offense of failure to drive within a lane if the person is operating a vehicle upon a roadway that is divided into two or more clearly marked lanes for traffic and the driver does not: (a) Operate the vehicle as nearly as practicable entirely within a single lane; and (b) Refrain from moving from that lane until the driver has first made certain that the movement can be made with safety." Or. Rev. Stat. § ("ORS") 811.370.

OPINION & ORDER – 3

identified him as Shalon Freeman; he could not provide proof of insurance. Officer Sherwood returned to the patrol car to conduct a records check. During the check, he confirmed the Dodge was not registered in Freeman's name, and that its insurance had expired. He also discovered that Freeman was on post-prison supervision for Attempted Robbery II and Attempted Assault II. Officer Sherwood knew that Freeman had been involved in a shooting about a month prior, and that Freeman was an active member of the Woodlawn Park Blood gang. He suspected Freeman might be carrying a gun and called for backup.

Meanwhile, Officer Hughes moved to the driver window and engaged Freeman in small talk. Officer Hughes testified that Freeman seemed nervous, and Hughes then left the car and returned to the patrol car to report to Officer Sherwood his observations of Freeman's behavior. The officers switched positions—Officer Sherwood left the patrol car and returned to the Dodge to contact Freeman; Officer Hughes entered the patrol car to finish the records check and to write Freeman a ticket for failing to drive within his lane.

While Officer Hughes was completing the ticket, Officers Brian Dale and Patrick Murphy arrived on the scene as backup, approximately five or six minutes after the initial stop of Freeman's car. They parked their patrol car near the traffic stop, exited the vehicle and approached Freeman's car. Officer Murphy noticed the bullet holes in the driver door as he moved around to the passenger side. Officer Dale joined Officer Sherwood at the driver window.

As Officers Dale and Murphy were arriving on the scene and taking position around the car, Officer Sherwood asked Freeman if he would consent to a search. Officer Sherwood testified that Freeman gave consent to "search the car"; Freeman disputes that he gave such consent. Officer Sherwood testified that he then informed Freeman that, to effect a search of the car, Freeman would have to exit the vehicle and that Officer Sherwood intended to pat him down

OPINION & ORDER – 4

because he believed Freeman might be carrying a weapon. Officer Sherwood told Freeman to put his hands behind his head, with his fingers interlaced, and that he would help Freeman out of the car. Freeman began to comply, and then paused: "Can I have my wallet?" he asked (Officer Sherwood had placed it on the roof of the car during his initial contact with Freeman). Officer Sherwood complied. Freeman rifled through the wallet, pulled out a white card, and handed it to Officer Sherwood. The card read:

GIVE THIS CARD TO OFFICER

Officer,

Other than providing my driver's license, registration and proof of insurance, I do not wish to provide any information until I have consulted with my attorney. If he cannot be reached, I would like a public defender. I would like to talk with my lawyer now.

If you wish to question me, or wish to obtain a waiver, I want my lawyer present. I do not want my person, car or other property to be searched. I do not want to perform any physical acts or tests. I do not want to participate in a lineup, nor do I consent to being recorded.

If requested to take a breath test, I want to talk to a lawyer first. If I can't get legal advice, I will submit to the test only if my driver's license will otherwise be suspended or revoked. If a breath test is given, I also want to have an independent blood test. If I am under arrest, I would like to arrange to secure my property. I do not consent to any impound or inventory of my vehicle or other property, but I do waive any claim against you for theft, loss or damage if you allow me to safeguard my own property. If I am not under arrest, I want to leave. Please tell me so I may go on my way. Thank you.

Def. Ex. 209. Officer Sherwood testified that he did not read the card.

During Freeman and Officer Sherwood's conversation about the search, pat down, and the card, Officer Murphy moved into position on the passenger side of Freeman's car. The window was fully lowered, and Officer Murphy could see into the car. He observed that Freeman was slouching unusually, and appeared to be using his right arm to block view of his pockets on

OPINION & ORDER – 5

that side. Using his flashlight, Officer Murphy tried to see what Freeman seemed to be hiding—as Freeman turned his body while talking with Officer Sherwood, Officer Murphy saw what he believed was the bottom of a magazine plate and part of a semi-automatic handgun. He motioned for Officer Dale to come over from the driver's side.

"Do you see what I see?" he asked Officer Dale.

Officer Dale looked into the car with his flashlight and confirmed: "Oh yeah, that's a gun." Officer Dale loudly declared that he saw the gun, and then used the radio to announce there was a gun on the scene. It was 11:29 p.m., approximately nine minutes after Officers Sherwood and Hughes initiated the traffic stop. Officers then arrested Freeman and seized the gun. Officer Dale requested a hazard tow for the vehicle because there was not a legal driver on the scene, and the rear of the car was stuck out into traffic, about two feet from the curb. Prior to the tow, Officer Dale inventoried the vehicle and discovered ammunition and a 9mm magazine.

## DISCUSSION

Freeman moves to suppress all evidence seized during the October, 2015 encounter, including the gun officers found in his pocket and the ammunition officers found in his car. He also moves to suppress all statements he made to officers during the stop and his arrest. Freeman argues that the officers lacked reasonable suspicion to stop his car. He also argues that officers lacked reasonable suspicion or probable cause to search his person, and that any statements he made to officers should be suppressed because he did not knowingly and voluntarily waive his Miranda rights.

**I.     Reasonable Suspicion for Stop**

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures by the government. U.S. Const. Amend. IV; Elkins v. United States, 364

U.S. 206, 213 (1960) (applying Fourth Amendment to states and state actors through Fourteenth Amendment). A police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)); see also United States v. Lopez–Soto, 205 F.3d 1101, 1105 (9th Cir. 2000) ("[T]he Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops."). "In evaluating whether the stop of a vehicle satisfies the reasonable suspicion standard, we must look to the 'totality of the circumstances.' " United States v. Valdes–Vega, 685 F.3d 1138, 1144 (9th Cir. 2012) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). Whether the suspicion is reasonable is an objective inquiry. See Whren v. United States, 517 U.S. 806, 813 (1996) (officer's subjective intent irrelevant).

      Both Officer Sherwood and Officer Hughes testified that they observed Freeman make numerous swerving maneuvers out of his lane while driving closely behind a TriMet bus. Both officers testified that they believed Freeman's erratic driving was unsafe because his sudden movement into the oncoming lane left little opportunity for other drivers to react safely. Freeman offered testimony from two witnesses who were driving in the car between his Dodge and Officers Sherwood and Hughes; the witnesses testified that Freeman did not leave his lane and was driving safely. The Court finds the officers' testimony more credible, in part because, when Officer Sherwood first contacted Freeman after pulling him over, Freeman apologized for the way he was driving, and explained that he was thinking about passing the bus. Def. Ex. 201.

      As mentioned above, the relevant Oregon statute provides:

(1) [A] person commits the offense of failure to drive within a lane if the person is operating a vehicle upon a roadway that is divided into two or more clearly marked lanes for traffic and the driver does not:

OPINION & ORDER – 7

>    (a) Operate the vehicle as nearly as practicable entirely within a single lane; and
>    (b) Refrain from moving from that lane until the driver has first made certain that the movement can be made with safety.

ORS 811.370. Because the officers observed Freeman leave his lane in an unsafe manner, they had reasonable suspicion to stop his car for violating ORS 811.370.

Freeman argues that officers did not have reasonable suspicion to stop him because the statute "allows drivers to move outside their lane of traffic when it is safe to do so." Def. Mot. to Suppress at 9, ECF 24. Furthermore, Freeman asserts that the statute did not apply to him because Oregon case law suggests the law was meant to apply solely to drivers under the influence of intoxicants, and there was no evidence that he was under the influence. Id. at 9–12. Those arguments are unavailing. First, Officers Sherwood and Hughes both testified that they believed Freeman was, in fact, driving in an unsafe manner by following as close as five or ten feet behind a bus, and then swerving suddenly into the oncoming lane and back several times. That testimony is sufficient to establish reasonable suspicion for the officers to stop Freeman for violating ORS 811.370. Second, there is nothing in the statutory text to suggest it applies only to drivers who are under the influence of intoxicants. The two acts are wholly separate statutory violations and an officer can legally pull over a driver on suspicion of violating either one. Compare ORS 811.370 (failure to maintain lane) with 813.010 (driving while under the influence of intoxicants); see also State v. Vanlom, 232 Or. App. 492, 495, 498, 222 P.3d 49, 50, 52 (2009) (affirming conviction for driving under the influence after officer legally stopped driver for failing to maintain lane, and noting that the trial court did not determine whether the officer had reasonable suspicion for driving under the influence "[b]ecause it was unnecessary to do so.").

//

OPINION & ORDER – 8

## II.    Unlawful Seizure of Defendant

Freeman asserts that his Fourth Amendment rights were violated when Officer Sherwood returned to the driver window and asked for Freeman's consent to search his vehicle. At that point, Freeman argues, Officer Sherwood was no longer engaged in a traffic stop, but rather a new investigation of criminal activity that was unsupported by reasonable suspicion.

Generally, a traffic stop must be limited in duration to the time necessary to effectuate the purpose of the stop. Melendres v. Arpaio, 695 F.3d 990, 1000 (9th Cir. 2012) ("[A] detention beyond the duration of the initial traffic stop must be supported independently by reasonable suspicion of criminality."). At the same time, however, "mere police questioning does not constitute a seizure," and no reasonable suspicion is required to justify questioning that does not prolong a lawful stop. Muehler v. Mena, 544 U.S. 93, 100–01 (2005) (citation omitted); see also Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) (explaining that the "Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention.") (citing Arizona v. Johnson, 555 U.S. 323, 327–328 (2009); Illinois v. Caballes, 543 U.S. 405, 406–08 (2005)). Ultimately, the court must engage in a "fact-specific reasonableness inquiry" and examine the "totality of the circumstances" to determine whether the stop was reasonable. United States v. Turvin, 517 F.3d 1097, 1101 (9th Cir. 2008).

Officers Sherwood and Hughes initiated a traffic stop of Freeman's vehicle for failing to drive within its lane at approximately 11:20 p.m. During the course of the traffic stop, officers discovered that the driver, Freeman, was not the registered owner of the vehicle, and that the vehicle's insurance appeared to have expired. Officer Hughes had begun writing Freeman a ticket for failing to maintain his lane. Officers also learned that Freeman was on post-prison supervision for attempted robbery and attempted assault. Officer Hughes testified that, in

completing a records check with an individual on supervised release, he typically contacts the probation officer to determine the conditions of the probation or to check for any outstanding warrants not yet reflected in the police database. He testified that such a check, when conducted after hours like this one, can take up to fifteen minutes. Before he could reach a probation officer, however, Officers Dale and Murphy arrived on the scene, and at 11:29 p.m., spotted the gun in Freeman's pocket.

"Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop." Rodriguez, 135 S. Ct. at 1615 (citation and quotation marks omitted). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. (citations omitted). The approximately nine minutes that elapsed between the stop of Freeman's car and the officers seeing a gun in plain view on his person was a reasonable duration of time for officers to have stopped Freeman's car and conduct activities related to the traffic stop, especially considering that Freeman was not the registered owner of the car and he was on supervised release. Accordingly, the Court finds that Freeman's Fourth Amendment rights were not violated, and his motion to suppress is denied.

Freeman argues that, under Oregon law, officers were required to have reasonable suspicion supported by specific and articulable facts to further detain Freeman and seek his consent to search for weapons. Def. Supp. Memo. at 18–19, ECF 44 (citing, among others, State v. Jimenez, 357 Or. 417, 427, 353 P.3d 1227, 1232 (2015); State v. Miller, 277 Or. App. 147, 153, 370 P.3d 882, 885 (2016)). It is well-settled, however, "that evidence will only be excluded in federal court when it violates federal protections, such as those contained in the Fourth Amendment, and not in cases where it is tainted solely under state law." United States v.

Cormier, 220 F.3d 1103, 1111 (9th Cir. 2000). And as noted above, federal law is clear that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Johnson, 555 U.S. at 333. The nine minutes that elapsed between the stop of Freeman's car and the discovery of the gun was, under the circumstances, a stop of reasonable duration. Neither Officer Sherwood's request for Freeman's consent to search the car, nor Officers Dale and Murphy's presence on the scene, extended the duration of the stop. Officer Murphy testified that he saw the gun in plain view while standing on the sidewalk and looking into the Dodge with his flashlight. Under federal law, the stop was constitutional and suppression of the gun is not warranted.[3]

### III.   Freeman's Statements

Freeman also seeks to suppress statements he made to the officers while he was detained and subsequently arrested because, he asserts, he did not knowingly and intelligently waive his Miranda rights. Def. Mot. at 21. To the extent Freeman is challenging any statements made to police during his initial contact with Officer Sherwood, those statements are not subject to Miranda because Freeman was not, at that time, subject to custodial interrogation. United States v. Butler, 249 F.3d 1094, 1098 (9th Cir. 2001) (explaining the Miranda only applies to "custodial interrogation," and that a traffic stop is one of the "scenarios in which a person is detained by law enforcement officers [and] is not free to go, but is not 'in custody' for Miranda purposes."). As for any statements Freeman made after producing the card to Officer Sherwood during their

---

[3] Freeman's counsel conceded at oral argument that his motion to suppress physical evidence rose and fell with the legality of the stop and its duration. Since the Court determined the stop was legal and the gun discovered in plain view during a stop of reasonable duration, evidence found in Freeman's car after he had been arrested and the car ordered towed is not subject to suppression.

OPINION & ORDER – 11

second interaction, the Court reserves ruling on their admissibility unless and until the Government indicates that it intends to introduce such statements as evidence.

## CONCLUSION

Freeman's motion to suppress [24] is denied as to the physical evidence because officers had reasonable suspicion to stop his car for a traffic violation and officers observed the gun in plain view during a traffic stop of reasonable duration. His motion to suppress statements made to the police is denied as to statements he made during the initial encounter with Officer Sherwood; the Court reserves ruling on the admissibility of statements made after he produced the card to Officer Sherwood.

IT IS SO ORDERED

Dated this \_\_31\_\_ day of \_\_August\_\_, 2016.

_____
MARCO A. HERNÁNDEZ
United States District Judge

OPINION & ORDER – 12